**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James R. LOWENBERG, Randall E. Campbell, and Michael Palumbo, Defendants-Apellants.**

**No. 87–1610.**

United States Court of Appeals, Fifth Circuit.

Aug. 15, 1988.

Rehearing and Rehearing En Banc Denied Sept. 23, 1988.

Gerhard Kleinschmidt, Fort Worth, Tex., for Lowenberg.

Tex McConathy, Dallas, Tex., for Campbell.

D. Mark Elliston and Steven D. Davidson, Dallas, Tex. (court appointed), for Palumbo.

Sara Criscitelli, Atty., U.S. Dept. of Justice, Washington, D.C., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GOLDBERG, GARWOOD and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Three defendants challenge their convictions for multiple counts of use of the mails to facilitate prostitution in violation of 18 U.S.C. § 1952(a) and (b).[1] They were found guilty by the jury, and, although these defendants raise myriad issues, we find no basis for reversing that verdict and affirm their convictions.

I

Lowenberg and Campbell leased buildings in Dallas, Texas and then sublet them for use as nude modeling studios. Palumbo was Campbell's employee. The relationship between Lowenberg and Campbell and their relationships with the studios was contested at trial, but it is clear that they worked together in the operation of nude modeling studios in Dallas; Lowenberg referred to Campbell as his "partner." As to their relationship with the respective studios, at trial the government presented evidence that they hired managers and otherwise, directly and indirectly, supervised these studios that served as fronts for prostitution. The government also presented evidence from which the jury could reasonably infer that all three defendants were aware that acts of prostitution regularly took place at the studios.

The case against these defendants is the result of a sting operation by the Colorado Bureau of Investigation (CBI). The CBI created a fictional business entity, Investment Mortgage and Credit (IMAC), to process credit card vouchers for businesses such as nude modeling studios that are frequently fronts for prostitution. Although the motivation for the Colorado agency to set up a nationwide sting operation is unclear, IMAC randomly sent solicitation letters to several hundred such businesses, including several in the Dallas area. One of the letters reached Lowenberg, who then arranged a meeting with an IMAC representative, undercover CBI agent Hagerty. Lowenberg and Hagerty agreed that IMAC would process credit card vouchers for five nude modeling studios owned by Lowenberg and Campbell. They assigned the studios fictitious names for use on the credit card vouchers in order to avoid attracting the attention of local police and the Internal Revenue Service.

On several occasions during 1986, Lowenberg sent to IMAC, through the United States mail, credit card vouchers for charges at the studios. Vouchers from studios holding leases from Campbell were turned over to Campbell and then to Lowenberg, who sent the vouchers to IMAC. Palumbo collected vouchers from the studios for Campbell. Customers usually signed the vouchers in pairs: one for the "nude modeling session" and one for a "tip," which usually was for a standard amount that considerably exceeded the session fee. Purchases were generally described on the vouchers as "services" or "cash." Lowenberg claims to have charged studios a five percent fee for pro-

---

1. 18 U.S.C. § 1952 states in pertinent part:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to

(1) distribute the proceeds of any unlawful activity; or

....

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified ... shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means ... prostitution offenses in violation of the laws of the State in which they are committed or of the United States....

cessing the vouchers, but one of the studio managers testified that Lowenberg charged twenty percent on the "tip" charges. Campbell also apparently charged this twenty percent fee on the "tips." Checks for the amount of the vouchers, less IMAC's fees, were issued by Capital-Capital Limited (an alter-identity for IMAC) and were usually made payable to the order of Lowenberg or Palumbo. Checks payable to Palumbo were deposited into Campbell's business account, Rahab Investments Corp.

The defendants were tried to a jury on a fifteen-count indictment. Lowenberg was convicted on thirteen of the fifteen counts. Campbell and Palumbo, who were tried for aiding and abetting, were each convicted on four counts. The district court sentenced all defendants to five years' imprisonment, fined Lowenberg and Campbell, but suspended in favor of probation all of Palumbo's sentence and all but six months of Lowenberg's and Campbell's sentences.

## II

The defendants raise several issues on appeal. We will address the issues that each raises separately before resolving those that may affect all three.

## A.

■ Campbell claims that the district court erred when it permitted the prosecutor to ask government witness Larry Jensen, on redirect examination, about a suitcase the witness lost in Colorado valued at $50,000, which allegedly belonged to Campbell and which, it was brought out on re-cross, probably contained drugs. Campbell argues that this testimony was evidence of an extraneous offense and therefore inadmissible under rules 403 and 404(b) of the Federal Rules of Evidence.[2] Although the defendant presents this as a Rule 404(b)

issue, the extrinsic evidence rule is clearly not the issue here. Instead we examine whether Campbell was unfairly prejudiced under the circumstance in which this admittedly irrelevant and nonprobative evidence was allowed.

Larry Jensen, the government witness who had previously been associated with Campbell and Palumbo, was on the witness stand. Palumbo's attorney was completing his cross-examination of him, and parted with the question, "Mr. Jensen, what did you lose in Colorado that cost $50,000?" Jensen responded that he lost a suitcase. Although the reason for this "denoument" to the cross-examination is not perfectly clear, apparently Palumbo's attorney was seeking to impeach the testimony of Jensen by focusing on his involvement in suspicious activities. He did not ask him to whom the suitcase belonged or why it was worth $50,000. The prosecutor on redirect attempted to minimize whatever negative impression the statement might have left by bringing out testimony, over the objection of Campbell's attorney, that the mysterious suitcase belonged to Campbell, not Jensen. When asked what was in the suitcase worth $50,000, Jensen replied that he thought it was drugs. Of course, Campbell's attorney pressed his strenuous objection. The cross-examination, however, had clearly opened the door to the government's follow-up question about the ownership and the contents of the suitcase. *United States v. Lemaire,* 712 F.2d 944, 948 (5th Cir.), *cert. denied,* 464 U.S. 1012, 104 S.Ct. 535, 78 L.Ed.2d 716 (1983). Once the answer to the question indicated that drugs were in the suitcase, however, the trial court called the issue a "red herring," ruled it irrelevant and carefully instructed the jury to disregard the remark. In the light of the district court's ruling and in-

---

**2.** Fed.R.Evid. 404(b) provides: "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Fed.R.Evid. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

struction, there was no violation of Fed.R. Evid. 403.

## B.

■ Similarly, Campbell complains that the court erred when it permitted Jensen to testify that Campbell had previously ordered Palumbo to beat up Tony Jacobs, a manager at one of the studios, because Jacobs was holding back profits. Again he argues that this evidence was highly prejudicial and should have been excluded under Rules 403 and 404.

In this instance the evidence, although extrinsic, was relevant to the issue, contested by both Campbell and Palumbo, of whether they were actually involved in the day-to-day management of the studios, were frequent visitors there, and therefore knew that these studios were actually houses of prostitution. Jensen's testimony was offered to show that they were aware of the day-to-day accounting of the studios, to show they were concerned over their share of the profits, and to support other testimony that they therefore knew that these studios were fronts for prostitution. The evidence thus fell within the exception to Rule 404(b)—to show knowledge on the part of these defendants, a critical issue in the case. Its probative effect consequently outweighed any danger of *unfair* prejudice and the district court did not err in admitting Jensen's testimony.

## III

■ Defendant Lowenberg argues that the prosecution violated the Jencks Act and Fed.R.Crim.P. 16 when it failed to turn over the government's witness list and a memo written by agent Hagerty until the Friday evening immediately before trial. As the government notes, however, neither the Jencks Act nor Rule 16 requires disclosure of a witness's statements until *after* that witness has testified. *United States v. Campagnuolo*, 592 F.2d 852, 858 (5th Cir.1979). Furthermore, even to the extent that local rules may encourage early discovery, these issues were specifically ruled upon by the district court prior to and during trial. The government fully complied with the court's rulings and, in the absence of prejudice to the substantial rights of the defendant, the judgment of the district court is not reversible by this court. *United States v. Jennings*, 724 F.2d 436, 444 (5th Cir.), *cert. denied*, 467 U.S. 1227, 104 S.Ct. 2682, 81 L.Ed.2d 877 (1984).

## IV

■ Similarly Lowenberg claims that the district court erred when it cut off his attorney's cross-examination of agent Hagerty regarding whether Hagerty had agreed with the Dallas police to build a case against Lowenberg, Campbell, and Palumbo after the Dallas investigation had failed. Although the judge ruled that these questions could not be permitted on cross-examination because they exceeded the scope of the direct examination, that same day he permitted the defense to call Hagerty as a hostile witness.

Federal Rule of Evidence 611 makes clear that a trial judge is not required to permit cross-examination that exceeds the scope of the direct examination. *United States v. Carlock*, 806 F.2d 535, 553 (5th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1611, 94 L.Ed.2d 796 (1987). Moreover, the defense was permitted to elicit all the evidence it sought through this witness in the presentation of its own case. The fact that this examination was conducted on the same day minimized any alleged prejudice concerning the separation of time between the government's examination of Hagerty and Lowenberg's. Furthermore, Lowenberg's attorney did not object or complain about this alleged "temporal bias" until after the government rested, when he moved for a mistrial. Under these circumstances, the trial court clearly did not err.

## V

■ Lowenberg also argues that the district court erred when it permitted one government witness, police officer Simpson, to testify that his experience as a vice officer he had never found a nude

modeling studio that was not a front for prostitution. Both Campbell and Lowenberg objected to Simpson's testimony that he had previously told Lowenberg that if Lowenberg "opened up any more whorehouses or continued to [launder] credit cards through those whorehouses," he would file a case against him.[3] The defendants argue that these statements were impermissibly prejudicial and therefore should have been excluded under Rule 403.

Lowenberg's central defense was that he did not know about the prostitution occurring on the premises that he had leased. Both statements plainly related to whether Lowenberg had such knowledge. Indeed, Lowenberg does not contest the evidence on grounds of either relevance or competence. Furthermore, Lowenberg made no objection at trial to Simpson's first statement. The second statement was made in an earlier conversation between Simpson and Lowenberg after charges against Lowenberg in a state case that Simpson had investigated, were dropped. The statement was offered in order to explain the context of Lowenberg's response, an admission against self-interest that indicated that at that time he was aware that prostitution occurred in his buildings. As we have earlier noted, Lowenberg denied knowledge of the prostitution thoughout the trial, and it was, consequently, a critical issue. In neither case, therefore, did the district court abuse its discretion in allowing the testimony.

## VI

Both Campbell and Lowenberg argue on appeal that the prosecution made several highly inflammatory and prejudicial remarks to the jury regarding the character of the defendants. In his opening statement the government's attorney stated: "The evidence will show that in fact what Mr. Palumbo and especially Mr. Campbell and Mr. Lowenberg—what these people are, Ladies and Gentlemen, in the common street vernacular is they are pimps." In

his closing argument the prosecutor suggested that Lowenberg lived modestly only to avoid detection by the IRS. Also in his closing argument the prosecutor called Campbell a "filthy pimp" and "exhibitionist." Finally, the prosecutor stated that you could purchase sex acts on Industrial Boulevard in "two to ten minutes," and that "Mr. Lowenberg is aware of that little problem we are hearing about day and night this day and time called AIDS. If you let them continue to operate in the way they do, how are you going feel if somebody you know goes down there or has a contact...."

These remarks were clearly inappropriate. We fully recognize that in the heat of courtroom battles passions are sometimes high, and passion in the courtroom is usually acceptable. Nevertheless, such excuses cannot justify some of the prosecutor's conduct in this case. The prosecutor should and must perform his duties vigorously, and may, at times, do so even zealously; what he must not do is permit his ambitious desire to obtain a conviction to impinge upon the integrity he must maintain as a representative of the United States. As the Supreme Court has stated, "While he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). In this case, the district attorney failed to fulfil the duty of fairness and honor that he owed, not only to the defendants, but to the court and to the government he represents.

 The ultimate question before us, however, is not the impropriety of the prosecutor's remarks but whether these remarks were so inflammatory that they entitle the defendant to a new trial. A prosecutor's remarks to the jury constitutes reversible error only when they are both "inappropriate and harmful." *United States v. Chase*, 838 F.2d 743, 749 (5th Cir.), *cert. denied sub nom. Mesa v. United States*, —— U.S. ——, 108 S.Ct. 2022, 100 L.Ed.2d 609 (1988) (quoting *United States v.*

---

**3.** Simpson further testified that Lowenberg responded by saying, "You don't have to worry about that. AIDS will take care of those."

*Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985)). "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *Young,* 470 U.S. at 9, 105 S.Ct. at 1043. Instead, the appellants must show that the prosecutor's statement affected their substantial rights. *United States v. Saenz,* 747 F.2d 930, 942 (5th Cir.1984), *cert. denied sub nom. Solis v. United States,* 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985). In determining whether improper argument affects a defendant's substantial rights, the court should consider: (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instruction; and (3) the strength of the evidence of the defendant's guilt. *United States v. McPhee,* 731 F.2d 1150, 1152 (5th Cir.1984). "A conviction should not be set aside if the prosecutor's conduct ... did not in fact contribute to the guilty verdict and was, therefore, legally harmless." *United States v. Beckett,* 706 F.2d 519, 520 (5th Cir.1983). Under this standard we hold that none of the prosecutor's statements was so inflammatory or prejudicial that it constituted reversible error.

### A.

▇ The appellants first challenge the prosecutor's opening statement in which he described them as "pimps." This degrading term in fact characterized in "street vernacular," as opposed to "parlor parlance," the nature of the evidence as the prosecution viewed it. Furthermore, the defense failed to object to this error so that they are now entitled to a new trial only if it constitutes plain error. *See United States v. Young,* 470 U.S. at 13, 105 S.Ct. at 1045. This characterization, although crude and insulting, does not rise to that level. First, it was based reasonably upon the evidence, particularly when it is viewed in the light most favorable to the prosecution. Furthermore, not only did the defendants fail to object to this characterization, they used this characterization in their own arguments.

### B.

▇ Similarly, the defendants object to the prosecutor's statement at closing that Campbell was a "filthy pimp" and an "exhibitionist." The defense did preserve this issue on appeal by objecting to the statements at trial. Nevertheless, in the context of this trial as a whole and in the final argument in particular, we hold these errors to be harmless. First we note that the trial court instructed the jury both before and after the closing arguments were made that the opinions and interpretations of the evidence given by the attorneys were their own and could be accepted or rejected by the jury. The statement that Campbell was a pimp was made to reinforce the prosecution's interpretation of Campbell's actions. Just before making that statement, the prosecutor explained how Campbell put one of the witnesses into the prostitution business and how he collected a portion of her earnings, which was a fair interpretation of the evidence. The statement was in direct response to the defense's argument that Campbell was a businessman and could not be convicted as a "pimp." In this rather strained sense, the prosecutor's characterization was an "invited response." Although the Supreme Court reminds us that this doctrine does not mean that two wrongs would make a right, "the issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant." *Young,* 470 U.S. at 12, 105 S.Ct. at 1045. Although referring to the defendant as a *filthy* pimp was *certainly* uncalled for, and sadly lowers the degree of professionalism expected in a federal courtroom, we consider this statement in the context of the arguments of counsel, the entirety of the trial, and the strength of the case against Campbell and the other defendants. In this light, we hold that it was not so unfairly prejudicial to Campbell, or the other defendants, as to taint their convictions.

Similarly, when taken in context, the prosecution's reference to Campbell as an exhibitionist does not constitute reversible

error. The reference was brief and the prosecutor explained his comment to the jury when he stated that he had called Campbell an exhibitionist because Mr. Campbell stood up each time his name was mentioned in the manner of, according to the prosecutor, "a jack-in-the-box." Clearly, as Campbell argues on appeal, it was improper for the prosecutor to engage in name-calling simply because the defendant, at the advice of his attorney, stood up when his name was mentioned to facilitate identification. Given the brevity of this reference, however, and the justification given by the prosecutor, we think it most unlikely that the jury interpreted this statement to mean that Campbell was actually guilty of any kind of perverted or immoral personal habits.

### C.

 Again, the prosecutor's arguments in rebuttal, that Lowenberg lived modestly only because he feared detection by the IRS, were in direct response to the reference in closing argument to the defendant's modest lifestyle.[4] "The prosecution was entitled to make a fair response in rebuttal." *United States v. Williams*, 822 F.2d 512, 518 (5th Cir.1987) (citations omitted).

### D.

 Finally, we have the prosecutor's statement regarding the spread of AIDS. Clearly this argument was the most objectionable of all those made by the prosecution. It is, however, subject to two interpretations. The defendants argue that the only possible meaning of these statements was that the prosecutor intended to attribute the spread of AIDS to Mr. Lowenberg and his colleagues because they managed nude modeling studios. The prosecution, they contend, made this argument in an attempt to convince the jury to convict Lowenberg and close down the nude modeling studios, not because they believed that Lowenberg knowingly promoted prostitution, but because they found nude modeling studios, though legal, to be morally reprehensible. The jury would thus convict the defendants of crimes they did not commit in order to rid the community of these legal, but unpopular, studios. After careful review in the context of the entire trial, however, we cannot say that this was the prosecutor's intent or the message that he conveyed to the jury. Instead, these statements by the prosecutor could reasonably be interpreted to mean that he wished to impress upon the jury the serious consequences of illegal prostitution and to encourage them, *if* they found that Lowenberg, Campbell and Palumbo were indeed engaged in the promotion of prostitution, to convict these individuals notwithstanding any natural tendency they might have to favor the defendants. The prosecutor stated to the jury that he did not make these statements to inflame the jury but only to alert them of the seriousness of the crime with which they were dealing.

---

**4.** Specifically the defense stated in its closing argument:

> I am going to ask you to think back on Judy Lowenberg's testimony, and you'll recall she told you they lived in Los Robles Mobile Home in Arlington. Told you her phone number there. Said her husband drives an old 1983 Corolla. There was a police raid, and that was dropped, and they got their records back. Told you she had been working at Payless Shoe Store for two and a half years, said her husband has never had any other problems with the police ever and that he leases buildings, that he sells beepers, mobile phones ... you heard Judy Lowenberg testify the police came to his trailer home, and they came looking for him, and he had to turn himself in and then all of his records were seized and in the middle of this investigation after charges were brought the IRS

puts a levy on him.... You got that testimony from a witness who got told by Mr. Lowenberg that the IRS had put a million dollar levy on him. The IRS had already been through that case.

In response, the prosecutor stated in summation:

> Now, the other thing that [defense counsel] has led up to and brought out that Mr. Lowenberg is in some straight time. Lives in a trailer house and drives a couple of Toyotas. Let me tell you something. If you had the IRS chasing you around with a million dollar levy I doubt very seriously if any of you would be out in a half million dollar house driving a Cadillac. That would be just about like standing out in one of these thunderstorms we had with a lightning rod. You don't think Mr. Lowenberg doesn't know that.

Although we are not prepared to condemn the prosecutor for injecting the threat of AIDS into this case, he was certainly walking a very thin line. In our view the argument was imprudent, especially considering the emotionally charged state of the subject. In reviewing these remarks, however, we note that "counsel is allowed wide latitude in closing arguments and deference is due the district court's determination of whether those arguments are prejudicial and inflammatory." *Williams*, 822 F.2d at 518. Although an objection to these remarks was entered, it was overruled by the trial court, and so we accordingly take into consideration the trial court's determination that under the circumstances, these remarks were not unduly prejudicial. Furthermore, while the prosecutor is expressly prohibited from intentionally inflaming the jury, he may "impress upon the jury the seriousness of the charges." *United States v. Zylstra*, 713 F.2d 1332 (7th Cir.), *cert. denied*, 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983). The comments made here can be so interpreted and therefore we will not say that they constitute reversible error under the circumstances.

### E.

Finally, we consider the cumulative effect of the prosecution's alleged errors. *See United States v. Cardenas*, 778 F.2d 1127 (5th Cir.1985). In this regard, the issue is whether the prosecutorial misconduct during trial was "so pronounced and persistent that it permeates the entire atmosphere of the trial." *United States v. Blevins*, 555 F.2d 1236, 1240 (5th Cir.1977), *cert. denied*, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978). Again, although we regard some of the prosecutor's conduct as bordering on demagoguery, we cannot say, in view of the very strong evidence against them, the judge's cautionary instructions to the jury, and, finally, the statements made by their own attorneys, that this conduct violated the defendants' substantial rights.

### VII

Lowenberg argued at trial and on appeal that he was entrapped when agent Hagerty solicited his business. Specifically Lowenberg relies on the testimony of witnesses and taped conversations in which Hagerty assured Lowenberg and others that their business with IMAC was perfectly legal. Indeed, Lowenberg specifically stated that he did not want to violate the law. The question is whether, when Hagerty made these assurances, knowing that Lowenberg might well be charged with federal violations if he conducted business with Hagerty, it constituted entrapment even though Hagerty clearly did not encourage or entice Lowenberg to engage in the underlying illegal activity—prostitution.

The entrapment defense has two elements: (1) government inducement of the crime and (2) a lack of predisposition on the part of the defendant to engage in the criminal conduct. *Mathews v. United States*, — U.S. —, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988).

The Supreme Court has clearly established that entrapment is a jury question, not one for the courts. *Mathews*, 108 S.Ct. at 886; *Sherman v. United States*, 356 U.S. 369, 377, 78 S.Ct. 819, 823, 2 L.Ed.2d 848 (1958). In this case, the court instructed the jury on the issue of entrapment and the attorneys presented their argument to the jury. The jury obviously did not believe that under the circumstances Lowenberg was entrapped. Lowenberg now claims that he was entitled to a finding of entrapment by the district court as a matter of law. Such a ruling is appropriate, however, only "when no reasonable jury could have believed that [the] defendant was predisposed to commit the offense." *United States v. Rubio*, 834 F.2d 442 (5th Cir.1987); *United States v. Arteaga*, 807 F.2d 424 (5th Cir.1986). In this case, ample evidence of predisposition to promote prostitution and to use credit cards to distribute the proceeds of prostitution was presented upon which the jury could reasonably rely. Lowenberg contacted IMAC voluntarily after receiving what was obviously a mass mailing describing its services. The jury heard testimony that Lowenberg had been charged with credit

card fraud before and that when he made his deal with IMAC he bragged that he was back in the credit card business. The evidence established that he was already engaged in the nude modeling business long before he was approached by IMAC, and that he knew these studios were fronts for prostitution.

Thus the only act that Lowenberg was not "predisposed" to commit was to violate federal, rather than state, law by sending and receiving the proceeds of his illegal activities through the mails. As we have noted, Lowenberg in fact expressed some concern about the legality of this credit card factoring, and Hagerty assured him that there was nothing illegal about IMAC's business. The only question then is whether, when the agent made this assurance, he induced Lowenberg to commit an illegal act.

The government argues that when Hagerty told Lowenberg that the credit card factoring scheme was legal, he was telling the truth: the use of fictitious business names to factor credit card vouchers through the mail is not, by itself, an illegal act. It is only when the underlying business violates state law that use of the mails to collect proceeds from that business violates the federal law.

Lowenberg counters that Hagerty nevertheless intentionally induced him to commit a violation of federal law, because Hagerty must have known at the time he made his statement that Lowenberg was engaged in the promotion of prostitution, that the studios were a front for that business, and that by hiring IMAC to process his vouchers, Lowenberg would violate federal law. Indeed, Hagerty's only purpose in encouraging Lowenberg to become an IMAC client was to develop a criminal case against him. Nevertheless, this specific argument was made to the jury by Lowenberg's attorney in closing. The instructions given to the jury by the judge permitted them to decide whether Hagerty's statement had unreasonably enticed Lowenberg to commit an act that he was not predisposed to commit. The jury rejected the argument.

After reviewing the entire record and the great weight of evidence of Lowenberg's guilt compared to the relatively scant evidence of entrapment, we cannot say that, *as a matter of law,* the jury could not reasonably decide that Lowenberg was predisposed to factor credit card vouchers by mail. First, the jury was free to discredit Lowenberg's statement to Hagerty that he was not interested in breaking the law as self-serving, when considered in the light of his background of association with prostitution and credit card laundering. Additionally, regardless of whether the jury accepted Lowenberg's statement to Hagerty at its face value, the jury could reasonably conclude that Hagerty's assurance to Lowenberg was not an unreasonable one under the circumstances and did not induce Lowenberg to violate any law that he was not already predisposed to violate. For these reasons we hold that Lowenberg is not entitled to a finding of entrapment as a matter of law.

### VIII

Finally, each defendant challenges the sufficiency of the evidence upon which his conviction was based.

When reviewing the sufficiency of the evidence, the court views the evidence in the light most favorable to the government, accepting all credibility choices and reasonable inferences from the evidence that support the verdict, and then determines whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983); *United States v. Basey,* 816 F.2d 980, 1001 (5th Cir.1987).

In this case, viewing the evidence in the light most favorable to the government, we find that sufficient evidence existed to convict each defendant.

### A.

Lowenberg does not deny that he engaged in business with IMAC and mailed

the credit card vouchers in order to distribute proceeds of the nude modeling studios which he leased and in turn subleased to their managers. He claims, however, that the government's evidence was insufficient to show that he knew that the monies he collected were the proceeds of prostitution.

For a defendant to be convicted under 18 U.S.C. § 1952, the government need prove only (1) that the defendant used the mail and (2) that the defendant knew he was distributing proceeds from, or engaging in the promotion of illegal activities, e.g., prostitution. Lowenberg contests the evidence supporting the second prong— whether he *knew* that the vouchers he intentionally collected and mailed were the proceeds of an illegal activity. The evidence against Lowenberg on this issue, though contested, was substantial.

At trial the government presented three witnesses—Opal Palmer, a former employee and manager of one of the studios, Dallas police officer Dexter Simpson, and CBI agent James Hagerty—who all testified about specific conversations they had with Lowenberg in which he indicated that he knew that prostitution occurred at the studios and that these sexual services were sometimes paid for by use of the credit card vouchers he sent to IMAC. The jury heard taped conversations between Lowenberg and CBI agent Hagerty in which Lowenberg made incriminating statements. On these tapes, Lowenberg told Hagerty that new Dallas city ordinances, if enforced, would "push the prostitutes out of the modeling studios and onto the streets" and that the ordinances would close down modeling studios, because without prostitutes they would have no customers. He admitted to Hagerty that although he made it a rule not to know for certain, he assumed that the studios were fronts for prostitution. He also told Hagerty that he might be morally guilty because he knew the places were fronts for prostitution, though he believed he could not be proved guilty, because he made it a point not to go into the studios. Despite his statement that he did not go into the studios, Lowenberg nevertheless exhibited to Hagerty in their conversations a remarkable familiarity with

the layout of the studios. Furthermore, testimony from Simpson and building owner Jack Hamilton indicated that it was general knowledge that prostitution occurred inside these studios even if one did not frequently enter the buildings.

Finally, the jury could, as the government urged, reasonably conclude that Lowenberg knew from the way the credit card vouchers were completed (with two slips per customer, one a smaller amount for a "session" and the other an extremely large "tip") that the majority of the income generated by these studios came from payments for sexual services.

As this circuit has previously stated:

It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

*Bell*, 678 F.2d at 549. Clearly the jury weighed this evidence against Lowenberg's claim that he merely collected rent money for the studios without knowledge of how this money was actually obtained, and clearly the jury chose to believe the government's version of the facts. There was substantial evidence upon which it could base its decision.

### B.

██ Campbell and Palumbo were convicted of aiding and abetting Lowenberg. To prove this offense the government must prove "[a]n act on the part of the defendant which contributes to the execution of a crime and the intent to aid in its commission." *United States v. Phillips*, 664 F.2d 971, 1010 (5th Cir.1981), *cert. denied sub nom. Meinster v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Campbell argues that the evidence against him was insufficient because it showed no direct contact between him and IMAC. He claims, therefore, that the government failed to prove that he "intend-

ed to aid" in the commission of the credit card scheme.

The evidence shows, however, that Campbell delivered, and caused to be delivered, credit card vouchers to Lowenberg, knowing that Lowenberg directed IMAC to issue checks payable to Campbell through his corporate entity, Rahab, or Palumbo, who, the evidence indicated, was Campbell's employee. All these checks, which plainly came from a Colorado bank, were deposited in his corporate checking account. The government also presented evidence that indicated that Campbell was a business associate or partner of Lowenberg in connection with the nude modeling studios. Furthermore, there was witness testimony that Campbell knew and spoke about prostitution activities in his studios. Again, the jury could reasonably infer from the fact that he received credit card vouchers from the studios for "sessions" and "tips" and took a twenty percent fee from the "tip" vouchers, that he knew how these fees were generated. In short, this evidence was sufficient for a reasonable jury to hold that Campbell was a participant both in the prostitution activity and in Lowenberg's efforts to collect money from those activities by use of credit cards and the United States mail.

### C.

Finally, Palumbo argues that the government's case against him must fail for lack of sufficient evidence. Like Campbell, he was convicted of aiding and abetting Lowenberg's scheme. Similarly, he claims that the evidence does not establish his knowledge of, or intent to aid in the illegal activity. The evidence established that (1) Palumbo was Campbell's employee and (2) checks from IMAC made out to Palumbo and endorsed with his name were deposited in the Rahab account. Palumbo contends that this evidence, although proving an act that contributed to commission of the crime, was not sufficient to convict him of aiding and abetting because the government did not prove he actually knew that the studios were fronts for prostitution or that the credit cards were used to collect the resulting funds through the mail.

Again, although the evidence was contested at trial, it was sufficient for the jury to conclude that Palumbo was guilty of aiding and abetting the use of the mails to distribute proceeds from and otherwise promote prostitution. Although as Palumbo notes, the government introduced into evidence checks that bore his name without proving that they were endorsed by him, there was absolutely *no* evidence to suggest that the endorsements on the checks were *not* his signatures. Indeed, all the evidence presented would tend to indicate that Palumbo *did* endorse the checks. The government presented evidence that Palumbo visited the studios regularly and collected the vouchers for Campbell to give to Lowenberg who mailed the vouchers to Colorado. It is clear on the face of the checks that they were issued by a Colorado bank from the account of a Colorado corporation in Palumbo's name. The checks correspond to the vouchers he turned in to Lowenberg and they were deposited in the account of his employer. From this evidence the jury could reasonably conclude that Palumbo knew about the prostitution and the use of credit cards to collect proceeds from that illegal activity. It could further conclude that Palumbo facilitated this endeavor by permitting checks to be made out in his name, which he knew would be mailed from Colorado to Texas where he then endorsed them for deposit to Rahab. The verdict against Palumbo, therefore, was based upon ample evidence from which the jury could conclude beyond a reasonable doubt that Palumbo aided and abetted in the commission of the crime as charged in the indictment.

### IX

For the reasons given above, we find no basis upon which the defendants' convictions should be overturned. The questions presented here were correctly determined at trial by the jury and the district court, and the judgment of the district court is therefore

AFFIRMED.