# REVISED

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-60257

_____

UNITED STATES OF AMERICA

Plaintiff-Appellee,

versus

JOHN JOSEPH VACCARO; SAMUEL C MATRANA;
JOSEPH EDWARD JACKSON; VICTOR ROBERT HEACKLEY

Defendants-Appellants

_____

Appeals from the United States District Court
For the Southern District of Mississippi

_____

June 11, 1997

Before HIGGINBOTHAM, WIENER, and DENNIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is an appeal of convictions for violating RICO, conspiracy, interstate travel in aid of racketeering, and wire fraud. It centers on an alleged scheme to defraud the President Casino gambling boat in Biloxi, Mississippi. The indictment alleged that an organized group of casino employees and co-conspirators used marked cards to cheat and illegally "win" more than $500,000 at the blackjack tables. The jury was presented with a large cast, including characters with varying levels of responsibility in the casino and others with ties to organized crime. Defendant Joseph Jackson was an assistant shift manager in the casino "pit," the location of the blackjack games. John Grittini was the operations manager on another shift. Defendant Victor Heackley was the casino's pit administrator. Jackson, Grittini, and Heackley all worked for Gary Carroll. There was evidence

that defendant Samuel Matrana, a reputed "associate" of a New Orleans organized crime family, arranged the cheating "crews" and sent the playing cards from Mississippi to Florida to be "marked," and that Robert Asiel and Emory Etheridge, professional gamblers, were part of the "crew." The jury also heard testimony about Joe Gagliano, Anthony Carroll, and Frank Gagliano, reputed members of the New Orleans crime family, and Mike Kenny, who was the General Manager of the President. Grittini and Asiel were fugitives at the time of trial. The jury acquitted Etheridge, Joe Gagliano pled guilty, and Carroll testified under a grant of immunity.

Decks of playing cards used at the President's blackjack tables were stored in a locked cabinet or "stand" to which Jackson, Grittini, Heackley, and Carroll all had access. They were also responsible for blackjack operations at the casino. Carroll, the government's prime witness at trial, detailed the workings of the scheme. Carroll said he was first introduced to the scheme in June of 1993, when Grittini gave him several hundred dollars; Grittini explained that the money was for Carroll's help in putting marked cards into the blackjack games. Carroll testified that he did not, at that time, know what Grittini was talking about and in fact thought Grittini was lying.

Carroll later realized that the money had come from cheating the casino and learned that the source of the money was Joe Gagliano. Carroll later accompanied Grittini to Slidell, Louisiana, where he met with Vaccaro. Grittini introduced Vaccaro as a friend who had once saved Grittini's life.

A week after the Vaccaro meeting, Carroll traveled with Grittini to New Orleans to meet Frank Gagliano and Anthony Carroll. After the meeting, Grittini described the cheating operation to Carroll. The operation was to be a joint venture between the New Orleans crime family and another on the west coast. Gagliano, Matrana, and Asiel would assemble "cheating crews" to play blackjack at the President, and all Carroll had to do was help transport the marked cards to the blackjack tables. Grittini would get the unmarked cards, and Matrana would get them to Florida to be marked with "invisible" dye and return them to the casino. Matrana and Grittini would get the cards back into the locked stand. Carroll, Heackley, or Jackson would then put the cards in play

2

when and where Grittini ordered. A "crew" would show up, with one person "reading" the marked cards using special glasses and signaling to a player in a "cheating crew." Winnings would be divided among card players, the participating President employees, and the crime families.

The government introduced taped conversations of Grittini, taped conversations from Gagliano's deli in New Orleans, taped conversations from the Instant Replay lounge in Nevada, Grittini's journal allegedly detailing the scheme's profits, testimony from FBI agents that staked out the operation, and the results from FBI lab tests on the foreign substance found on some President playing cards.

The jury ultimately found Matrana guilty of the RICO charge, conspiracy to commit RICO violations, ITAR, and wire fraud charges. Heackley was found guilty on RICO, conspiracy, and wire fraud charges. The jury convicted Vaccaro and Jackson of the conspiracy and wire fraud charges and acquitted Etheridge.

## I

Defendants contend that eight separate remarks of the prosecutor during trial were, at least cumulatively, so inflammatory and prejudicial as to require a reversal. A prosecutor's argument is reversible error only when so improper as to affect a defendant's substantial rights. *United States v. Lowenberg*, 853 F.2d 295, 301 (5th Cir. 1988) *cert denied* 489 U.S. 1032, 109 S. Ct. 1170, 103 L.Ed. 2d 228 (1989). To determine whether substantial rights were affected we consider the following factors: (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instruction; and (3) the strength of the evidence of the defendant's guilt. *Id.; United States v. McPhee*, 731 F.2d 1150, 1152 (5th Cir. 1984). Where the prosecutor's conduct cannot be said to have contributed to the guilty verdict, it is legally harmless. *Lowenberg*, 853 F.2d at 301; *United States v. Beckett*, 706 F.2d 519, 520 (5th Cir. 1983). "The prosecutor should and must perform his duties vigorously, and may, at times, do so even zealously; what he may not do is permit his ambitious desire to obtain a conviction to impinge upon the integrity he must maintain as a

3

representative of the United States." *Id.* Finally, we assume that a jury has the common sense to discount the hyperbole of an advocate, discounting the force of the argument.

A

Defendant Heackley, joined by defendant Jackson, challenges the prosecutor's reference to the defendants as "criminals." In rebutting Etheridge's attorney's closing argument, the prosecutor argued that physical evidence linked Etheridge to the rest of the defendants:

> [On December 14, 1993] there's a picture of him with his old 365,000 deep brown Nissan. Okay. He's in the picture, it's got a Georgia tag, it's Emory Etheridge. Who's he with? Who's he with? He's with Joe Gagliano. John Grittini's over there. What do you think they're doing over there? [Do] you think that these guys all got together and said, "I'll tell you what, let's have this big meeting, let's tell everybody about it, let's get the FBI here, let them record it, then we can come into this courtroom in the Southern District of Mississippi . . . and we'll let them play that tape of this meeting that we're going to tell everybody about, and then they can go convict us? Do you think they got together and said that? No. They said we're going to do this in secret like conspirators. . . . You know why we [the government] conduct surveillance? We conduct surveillance-- the government conducts surveillance of criminals like Emory Etheridge and the rest of these criminals over here. They do that so they can catch them doing something because these guys aren't going to tell us.

The defense did not object at trial to this argument.

We review for plain error. *Lowenberg*, 853 F.2d at 302. The prosecution's main thrust with this statement was to persuade the jury to convict Etheridge--the only defendant acquitted on all charges by the jury. First, the argument has foundation in the record. The government did use surveillance to observe *criminal* activity *among these defendants* and others that, but for the surveillance tapes and photographs, would have been secret. Second, the prosecutor's statement responded to the argument of several defendants, including Etheridge, that the meetings among the defendants were innocent business encounters or chance meetings.[1] It is true that "two wrongs [do]

---

[1] Specifically, one of Etheridge's lawyers argued that:
All the blackjack players have a comradeship, they bow hall [sic] trying to beat the house, you know. And [Etheridge] knew Asiel. No one's arguing that. And he called [ ] Shorty to come down there and play with him at the Casino Grand. . . . The last time they saw him, you remember that, he was headed to Georgia, to his home, [be]cause Shorty wouldn't come and play with him. . . . So I ask you people to not let's be one of the first cases in the history of mine and your country where a man's liberty is taken and his name is destroyed solely because he happened to know Bobby Asiel and stopped by his room, stopped by his room. No evidence, [the prosecutor]

4

not make a right." *Id.* (citing *United States v. Young*, 105 S.Ct. 1038, 1045 (1985)). At the same time, we may consider the "invitation" in judging whether the prosecutor's "invited response" unfairly prejudiced the defendants. *Id.*

There was strong evidence that Etheridge and all four appellants here participated in a RICO conspiracy to defraud the President. As is so often the case, the argument was unnecessary to the government's case, and possibly improper. But it was not reversible error.

B

Defendant Vaccaro, joined by defendants Heackley and Jackson, objects to the prosecutor's implication that a cooperating witness had to be protected from the defendants. "Why in the world would a witness in a RICO case need to have relocation expense? Why would a witness against members of the New Orleans crime family need to have relocation?" Again, this statement responded to the defendants' closing arguments that the government's star witness, Carroll, lied in return for money.[2] The evidence at trial showed that the FBI spent approximately $40,000 on Carroll over a 15-month period, including Carroll's living expenses and several relocations for Carroll and his family.

---

didn't make an effort to show why.
Etheridge's other lawyer continued:

> [T]he reason Jimmy Etheridge is on trial here is because he knows some people who may have been associated in an improper scheme. . . . [T]he most the government has proved is that Etheridge may have been associated with some people who did wrong. . . . They never have Mr. Etheridge on a single one of their tape recordings. . . . But beyond that, they don't have any evidence that he ever made a telephone call that is connected to the conspiracy itself.

[2] Specifically, Etheridge's lawyer argued "I can think of-- in addition to the immunity for prosecution, I can think of 40,000 reasons . . . why you shouldn't believe what Gary Carroll had to say."

Jackson's lawyer argued that "Mr. Carroll testified for pay, he testified as an informer for pay, for immunity, for personal advantage. . . . What did I tell you in the opening statement? . . . An agent for the government [ ] will act and testify for the government, as the proof would show, for a price--Gary Carroll. . . . Gary Carroll [who is] not charged and being paid to testify."

Vaccaro's lawyer argued that "Mr. Carroll lied to you. . . . He wanted you to believe on direct testimony that he wasn't enjoying being part of this. That it was so scary to him he wanted to run away and hide. He looked you in the eye and lied to you. . . . He wanted you to think that he was some kind of, you know, 'I feel bad about this and I'm not proud of this.' Well he got to keep that shiny red Porsche, he got to keep all the money he stole, he got to keep the money that he got from the government and he got his freedom."

"The prosecution [is] entitled to make a fair response in rebuttal" to the arguments of defense counsel. *United States v. Williams*, 822 F.2d 512, 518 (5th Cir. 1987). The response accurately reflected the record in the case and the evidence already before the jury; the jury had heard Carroll accuse numerous people (including some of the defendants at trial) of being members of a New Orleans crime family, the jury knew the case was a RICO case, and the jury had heard evidence that the $40,000 referred to by the defendants' lawyers was for relocation. We find no error.

Relatedly, Jackson and Heackley contend that the prosecutor vouched for Carroll's truthfulness. The prosecutor explained to the jury:

> They [defendants and their attorneys] were really upset at the government for using Gary Carroll. I mean, and that's too bad but, you know, that's the breaks guys. That's the way things happen in the courtroom. You know, we'll -- we'll take the heat for the deal that was made with Gary Carroll. . . . You get to judge his credibility, you get to make all of those calls.

Mr. Vaccaro's attorney objected later. It is not proper for a government attorney personally to vouch for the credibility of a witness. Defendants argue that there is no way to interpret 'taking the heat' for a witness other than to describe it as vouching for the witness. We find the meaning of the statement less clear. The remark responded to the allegation that the government's witness had been paid to give false testimony. The prosecutor did not try to usurp the jury's role of assigning credibility; he clearly told the jurors that they would "get to judge his credibility." We find no error. Regardless, the prosecutor's statement that "You [the jury] get to judge his credibility, you get to make all of those calls," combined with the court's instructions that the jury need not "accept all of the evidence as true or accurate" and that "you are the sole judges of the credibility or the believability of each witness, and the weight to be given to the witness's testimony" served to alleviate the prejudice from any error.

C

Heackley, joined by Jackson, objects that the prosecutor told the jury that the money stolen from the casino was important because "when we allowed the gambling in the state, you all know it was also to help school districts . . . ." Although the government's brief does not address the issue,

6

at oral argument the government's lawyer also characterized this as an "invited response" to defendants' arguments. We are hard-pressed to see what, if any, comments made by the defendants' attorneys formed the "invitation"; regardless, there are some "invitations" that a prosecutor must and should decline. The district court agreed and sustained Etheridge's objection.

This is the only mention of school districts to which defendants point; there are no other government attempts to draw in emotion-evoking victims in the entire twenty-one-volume record. When the prosecutor tried this route, near the end of trial, the court sustained defense counsel's objection, cutting off further discussion. Given the length of this trial, the amount of evidence against the defendants, and the court's cautionary instructions that "statements of lawyers are not evidence" and "to base your verdict solely upon the evidence, without prejudice or sympathy," we find that defendants were not unfairly prejudiced by the prosecutor's statement. "Inappropriate prosecutorial comments, standing alone, [do] not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *Young*, 105 S.Ct. at 1044.

D

Defendants Jackson and Vaccaro object to statements made by the prosecutor regarding the defense's failure to call the FBI's case agent, Peralta, to the stand to buttress their case. Jackson objects to the prosecution's inference that there was an "easy" procedure that the defendants could use to call Peralta, while Vaccaro objects to the burden-shifting effect of asking the jury why the defense didn't call a witness. The issue arose when Jackson's attorney told the jury that "Mr. Peralta, the lead FBI agent on this case, present each and every day of this trial, sat only and sits only at the counsel table. Never on the witness stand." He then recited a series of questions he would have asked the agent had Peralta been called. Vaccaro's attorney also argued to the jury that "[t]hey didn't bring you Mr. Peralta," and that Mr. Peralta's testimony would have been helpful to his client. The prosecutor did not attempt to shift the burden to the defendants, but pointed out that a procedure was available to call the witness. Furthermore, the district court specifically instructed the jury that the

7

"defendants are not obligated to put on any proof . . . o[r] to present any evidence at all" in direct response to the prosecutor's Peralta argument. We find no error.

E

Defendants Jackson and Vaccaro object that the prosecutor impugned their attorneys during closing argument. Referring to the defendant's arguments about the absent defendant Grittini and the use of Carroll as a witness, the prosecutor referred to an "empty chair defense," and told the jury that "[t]hat's what defense lawyers do. . . . They earn their living trying to muddle the issues. Trying to make it as fuzzy as possible. That's their job--I try to make it--" Defense counsel objected, cutting off the rest of the prosecutor's sentence, and the court immediately sustained. The district court then instructed the jury that "the attorneys are obligated to represent their clients. . . . I caution you, as I have before, statements of attorneys are not evidence . . . ."

The prosecutor's statement that defense lawyers "muddle the issues" was clearly improper. The prosecutor was seeking to "draw the cloak of righteousness around the prosecutor in his personal status as government attorney and impugn[ ] the integrity of defense counsel." *United States v. Frascone*, 747 F.2d 953, 957-58 (5th Cir. 1984). This court has been clear that "[n]o prosecutor . . . may impugn the integrity of a particular lawyer or that of lawyers in general, without basis in fact, as a means of imputing guilt to a defendant." *United States v. McDonald*, 620 F.2d 559 (5th Cir. 1980). Nevertheless, where such an excessive statement comes in the heat of a closing argument in a hard-fought case, is objected to and immediately sustained, and subjected to an instant cautionary instruction to disregard it, it does not warrant reversal. *Frascone*, 747 F.2d at 958.

F

Finally, defendant Vaccaro objects to the prosecutor's reference to his parole status, and to a statement at closing that Vaccaro claims inaccurately attributed a taped statement between Joe Gagliano and Sydney Callahan to him. We find no error.

1

8

During the testimony of FBI agent Metz, the government played a tape of a conversation at Frank's Deli in New Orleans, suggesting that Vaccaro had been in New Orleans, met with Gagliano and other members of the New Orleans "family," and came to apologize for Grittini's attempts to set up a gaming school in New Orleans without "permission" from the Marcello "family." After part of the tape was played (the tape's transcript is 23 pages), the defense objected, pointing out that the tape contained references to Vaccaro's parole status.[3] The district court overruled defendants' motion for a mistrial, but told the government's attorneys to "move away from that."

Vaccaro argues that although the district court correctly determined that the evidence of Vaccaro's parole status was inadmissible, and although the prosecutor did not ask the witness any questions about Vaccaro's parole comments, the prosecutor "made sure that the jury would not forget when he reminded the jury" during closing argument. Vaccaro refers to a statement by the prosecutor during closing argument that "That's John Vaccaro -- he's been doing it all his life." However, the prosecutor's comments came during a review of the tapes of telephone conversations from the Instant Replay Lounge in Nevada. On the Instant Replay tape, Vaccaro complains to a coconspirator that "They want to argue with people that's been doin' it all their lives. See?" The prosecutor's quote that Vaccaro has been "doing it all his life" was a direct quote from Vaccaro about his experience with cheating schemes, which the prosecutor properly used to underscore the unlikelihood of Vaccaro's "innocent" association with the card scheme conspirators.

2

In his closing argument, the prosecutor argued:

The comment, the particular comment that I think Mr. Metz described to you [from a microphone recording in Frank's Deli] was that -- had the most visceral gut-wrenching effect on me sitting at the table, and I think you also must have sensed it somewhat, was the comment about the Christmas tree. Do you remember that one? The Christmas tree and how everybody wants a present, and Mr. Metz had to explain that after the Brilab situation and the Marcello family had been a little bit dormant,

_____

[3] The tape contains the following exchange between Vaccaro and Joe Marcello, Jr.:
Marcello: How long is your parole you're on that parole (unintelligible) and that's never (unintelligible) the casino.
Vaccaro: Well (unintelligible) the casinos.

9

and with the advent of gaming, this whole thing began to grow again and there was like a Christmas tree and everybody wanted a present. And that whole analogy was somewhat disturbing. **There's another comment that Mr. Vaccaro makes which is his apologies which fits in well with Gary Carroll and the rest of the witnesses who testified about this joint venture.**

Vaccaro argues that he never made the "Christmas tree" statement; the reference to a Christmas tree came from a tape-recorded conversation between Joe Gagliano and Sidney Callahan, but the prosecutor deliberately implied that the statement was uttered by Vaccaro. We find no error. The prosecutor stated "There's <u>another</u> comment that <u>Mr. Vaccaro</u> makes . . . ." Furthermore, the jury had heard both the tapes and had the transcripts for both the tapes; the record is clear that the "Christmas tree" conversation came from Government Exhibit 48, while the "apologies" evidence came from Government Exhibit 44. While the argument was a confusing one to make (Agent Metz testified about both recordings at trial), the prosecutor's closing arguments are a fair representation of both pieces of evidence.

G

We find misconduct in the prosecutor's arguments to the jury that the Mississippi gaming statutes were intended to fund school districts, and that defense counsel tried to "muddle the issues." We do not find prejudice sufficient to warrant reversal. The cumulative effect of these prosecutorial statements, both quickly halted by sustained objections and partially cured with instructions from the court, was harmless; we are not convinced that different actions by the district court would have produced "a very different trial." *See United States v. Riddle*, 103 F.3d 423, 434 (5th Cir. 1997). The jury was not given "hours" of testimony that it would otherwise not have heard, nor was its focus significantly redirected. *See id.*

II

Defendants challenge the sufficiency of the evidence to support their convictions. The measure is whether a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. We review the evidence and construe all reasonable inferences arising

10

from the evidence in the light most favorable to the jury's verdict. *United States v. Pedroza*, 78 F.3d 179 (5th Cir. 1996).

A

Matrana and Heackley were found guilty of substantive RICO violations.[4] The elements of a RICO violation under § 1962(c) are: (1) the existence of an enterprise that affects interstate or foreign commerce; (2) the defendant's association with the enterprise; (3) the defendant's participation in the conduct of the enterprise's affairs; and (4) at least two predicate acts of racketeering activity designated in 18 U.S.C. § 1961(1). *United States v. Elliott*, 571 F.2d 880, 897-99 (5th Cir.), *cert. denied*, 439 U.S. 953 (1978). There is sufficient evidence in the record to support Matrana's and Heackley's involvement in an enterprise that also included Grittini and others. There is abundant evidence that this enterprise operated a cheating scheme at the President. The casino manager testified that he noticed certain players' activities that indicated cheating; they took hits when they should not have and stayed when they should have taken hits. The "winnings" or profits from this scheme were reflected in Grittini's journal, which was admitted into evidence. There was testimony that Heackley facilitated the cheating by placing the marked cards on the table for play and that Matrana organized the cheating "crews." A recorded conversation between Grittini and Heackley was introduced by the government. In it, Heackley says: "Our golfing[5] . . . buddy, yeah but our golfing buddy is coming in today . . . ." The conversation continued:

---

[4] 18 U.S.C. § 1962(c) provides:
   It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or through collection of unlawful debt.

[5] There was substantial evidence at trial that the conspirators referred to the card-cheating scheme as "golf."

11

Grittini: "[Y]ou know the dozen golf balls I'm talking about . . . the bogus ones?  The ones that they altered to work in our favor."

Heackley: "Yeah, is there fifty-two balls in a box?"

Grittini: "Right."

Heackley: "We gotta find somebody to play with them."

FBI surveillance of Matrana traveling from Louisiana to Mississippi to meet Grittini and receiving a package was also introduced.

B

Mississippi Code Ann. 75-76-307 states that "[i]t is unlawful for any person, whether he is an owner or employee of or a player in an establishment, to cheat at any gambling game."  Section 309 states that "[i]t is unlawful to mark, alter, or otherwise modify any associated equipment or gaming device in any manner . . . ."  These code sections were enacted on April 20, 1993.  Defendant Vaccaro, joined by Jackson and Heackley, argues that the evidence was insufficient to show a violation of Mississippi Code sections 307 or 309, or alternatively that his RICO conspiracy conviction violated the ex post facto clause to the extent that the offenses occurred prior to April 20, 1993.[6]

We disagree.  The reference to state law in a RICO indictment serves a "definitional purpose." *United States. v. Welch*,  656 F.2d 1039, 1058 (5th Cir. 1981) *cert denied*, 456 U.S. 915, 102 S. Ct. 1767, 72 L. Ed. 2d 173 (1982).  "The reference to state law in the federal statute is for the purpose of defining the conduct prohibited and for the purpose of supplementing, rather than pre-empting, state gambling laws."  *Id.* (internal quotation omitted).  Defendants have put forward nothing to suggest that cheating at gambling was legal in Mississippi before the Code sections at issue were enacted. *See, e.g.*, Miss. Code Ann. § 97-19-39 (obtaining signature or thing of value with intent to defraud--the so-called "false pretenses" statute).  We have explained that the evidence was sufficient to support RICO convictions for cheating at cards in violation of Mississippi law.

---

[6]  The earliest acts alleged in the indictment were committed in January, 1993.

C

Appellants were found guilty of conspiracy to commit a RICO offense. They argue that the government must prove that a defendant agreed to commit personally two or more predicate acts. The circuits are split on this issue although the law of this circuit is settled. To be guilty of a RICO conspiracy, the conspirator "must simply agree 'to the objective of a violation of RICO; he need not agree personally to violate the statute.'" *United States v. Marmolejo*, 89 F.3d 1185, 1196 (5th Cir. 1996) (internal quotation omitted) (gathering cases), *cert. granted in part*, 117 S.Ct. 1079 (1997). *Marmalejo* is binding on this panel. This issue is now before the Supreme Court and will be argued this fall.

More than adequate evidence was introduced at trial showing that each of these defendants "simply agreed" to engage in the President cheating scheme. Evidence at trial demonstrated that Vaccaro met with his coconspirators and talked to them by telephone. The jury was entitled to conclude that the substance of these conversations related directly to the racketeering acts charged in the indictment. The jury was free to infer that Vaccaro actively directed, sponsored, and monitored the progress of the scheme. His meetings with his coconspirators could be viewed by the jury as evidence that he agreed to the President scheme. Similar evidence connects Heackley, Jackson, and Matrana to the agreement.

D

A wire fraud conviction requires proof of (1) a scheme to defraud and (2) the use of interstate wire communications in furtherance of the scheme. *United States v. Gray*, 96 F.3d 769, 773 (5th Cir. 1996), *cert. denied*, 117 S.Ct. 1275 (1997). Under 18 U.S.C. § 1343, "once membership in a scheme to defraud is established, a knowing participant is liable for any wire communication which subsequently takes place or which previously took place in connection with the scheme." *United States v. Faulkner*, 17 F.3d 745, 771-72 (5th Cir.), *cert. denied*, 513 U.S. 870 (1994).

There is sufficient evidence of a scheme to defraud the President casino and of each of these defendants' agreements to participate in the conspiracy. The evidence introduced at trial included

13

tapes and transcripts of 55 intercepted wire conversations, including wiretaps on Grittini's home, Grittini's dealer's school, Frank's Deli in New Orleans, and the Instant Replay lounge. The jury heard the contents of the Heackley-Grittini phone calls regarding the scheme and the "fifty-two [golf] balls" altered to work in the schemers' favor. The jury also heard a phone conversation between Matrana and Grittini in which they agreed to meet at "the midway point" between New Orleans and Biloxi, which turned out to be Slidell, as well as calls by Vaccaro from Nevada to Louisiana and Mississippi. Given the plethora of recorded telephone conversations admitted into evidence, the jury could have found that one or more of the conspirators used interstate wires in furtherance of the cheating scheme. Vaccaro's argument that he did not personally make any calls "between" the states alleged in the indictment is meritless. The jury was properly instructed that it could find him guilty as a knowing participant of the "scheme to defraud" that used interstate wire communications "in furtherance of the scheme." *Faulkner*, 17 F.3d at 771-72.

E

The jury convicted Matrana of the ITAR charges. To prove an ITAR violation, the government must prove that the defendant traveled in interstate commerce with the specific intent to engage in or facilitate illegal conduct in furtherance of a criminal enterprise. *United States v. Ramos*, 71 F.3d 1150, 1156 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 1864 (1996). The jury heard evidence that Matrana traveled from Louisiana to Biloxi, Mississippi, in January of 1994 to meet Grittini. Matrana received a package approximately 16 inches long and 2.5 inches thick. The jury could fairly conclude that this package was a box of cards, an example of which was also placed into evidence as Government Exhibit 30. The jury also had before it the contents of phone calls between Matrana and Grittini, which implicate Matrana in the cheating scheme, and evidence that Matrana induced Grittini to travel from Mississippi to Louisiana on two other occasions. There was ample evidence introduced to support Matrana's conviction.

III

We find no merit in any of defendants' remaining arguments, and we reject them without further comment.  The judgments are AFFIRMED.