IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————————

No. 06-41233

———————————————————

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 13, 2007

Charles R. Fulbruge III
Clerk

UNITED STATES OF AMERICA
Plaintiff-Appellee

v.

PAUL LANCE CAMERON BENNETT
Defendant-Appellant

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
No. 04-22

———————————————————

Before DENNIS, PRADO, Circuit Judges, and ENGELHARDT, District Judge.[*]

KURT D. ENGELHARDT, District Judge:[**]

Paul Lance Cameron Bennett now appeals his conviction for violating the Mann Act, 18 U.S.C. § 2423(a), as well as the sentence he received, raising various grounds of error. For the following reasons, we affirm in all respects.

———————————

[*]     District Judge for the Eastern District of Louisiana, sitting by designation.

[**]     Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

**FACTS AND PROCEEDINGS**

On March 17, 2005, Paul Lance Cameron Bennett was charged by superseding indictment with one count of kidnaping and two counts of violating the Mann Act, which criminalizes transporting a minor child across state lines to engage in criminal sexual activity.[1]

The minor victim in this case, identified by M.C.W., was born on October 30, 1990. She lived with her parents, Cynthia and David, in League City Texas, in the Southern District of Texas. During the summer of 2004, M.C.W. was 13 years old and preparing to enter the eighth grade at Webster Intermediate, where she was enrolled in the gifted and talented program.

M.C.W. had a troubled home life. She testified that her father had physically and verbally abused her for as long as she could remember. She also testified that her father would touch her breasts and other body parts in a sexual manner and sometimes would get into bed with her and fondle her. M.C.W.'s friend, identified by A.L., testified that M.C.W. complained to her that her father would get drunk, call her fat, and physically abuse her. A.L. also testified that M.C.W. "always talked about running away." M.C.W. testified that she lost her virginity at age eleven. At trial, M.C.W.'s parents admitted to

---

[1] Count One alleged a violation of 18 U.S.C. §§ 1201(a)(1) and 1201(g) (kidnaping a minor). Count Two alleged a violation of 18 U.S.C. § 2422(a)(knowingly persuading, inducing, and enticing a thirteen-year-old to travel in interstate commerce to engage in criminal sexual activity). Count Three alleged a violation of § 2423(a)(knowingly transporting a thirteen-year-old in interstate commerce with intent that the thirteen-year-old engage in criminal sexual activity). Particularly, the "criminal sexual activity" in this case consisted of violations of California and Nebraska statutes criminalizing the act of sexual intercourse with a person under 16 years of age.

having problems with both alcohol and drugs.

M.C.W. often spent time on a website called Elfwood, a science fiction and fantasy art site that functioned in part as an interactive art gallery where users posted their art and received feedback from others. M.C.W. created her own webpage on Elfwood. She also frequented Elfwood's companion website, Elftown, where people posted personal information and profiles in order to meet others. In her Elftown profile, M.C.W. listed her age and described herself as bisexual.

While using Elftown, M.C.W. came upon Paul Bennett's website. Bennett, who was born on December 18, 1981, dropped out of high school after his first year. In 2004, he was 22 years old. During the summer of 2004, Bennett lived at home with his mother in Walla Walla, Washington. On July 24, 2004, after noticing that M.C.W. had visited his webpage, Bennett sent M.C.W. an email asking her what she thought about his page. M.C.W. responded, and over the next few months, M.C.W. and Bennett communicated frequently via email and instant messaging.

In the emails, which were produced at trial, M.C.W. and Bennett discussed various things, including Bennett's roommate problems, marijuana use,[2] M.C.W.'s abusive

---

[2] The subject of M.C.W.'s marijuana use was discussed at several points during the trial. In one of the emails to Bennett, she revealed that she and her mother had smoked marijuana together when M.C.W. was twelve. At trial, M.C.W. confirmed this fact and also revealed that she and her mother smoked marijuana together in the FBI-provided hotel room in San Francisco on the night that M.C.W. was recovered.

relationship with her father, and M.C.W.'s relationship with her then-boyfriend, Anthony, whom she had also met online.[3] In other emails, M.C.W. discussed her bisexual experiences, revealed that the boys at school viewed her as a "slut," boasted that she was good at sex, and stated that she had a preference for dating older guys. M.C.W. testified that she was interested in Bennett and that in many of the emails, she was flirting with him and trying to get him interested in her.

Bennett's tone and language in the emails became increasingly flattering, romantic, and suggestive. For example, during many of the communications, Bennett complimented M.C.W., telling her that she was "awesome" and that he thought she was "a doll." In one email he told her: "The hair looks great as do you, as usual . . . I really missed you . . . ." Bennett often referred to M.C.W. as his "other half" and his "love." In one email he told M.C.W., in response to her revelation about being sexually abused, that he would "come and kill all those stupid people" and that he loved her.

In another email Bennett told M.C.W. that he'd grown to like her more and more and that he didn't think she was "stupid or a little girl trying to get attention." In the response email, M.C.W. specifically mentioned their nine year age difference, to which

---

[3] Unlike Bennett, Anthony and M.C.W. were close in age. M.C.W.'s mother testified that she found out from Anthony's mother that he and M.C.W. were planning on running away together. M.C.W.'s friend, A.L., testified that M.C.W. informed her of this plan. M.C.W. testified that her relationship with Anthony ended when his parents discovered naked pictures of M.C.W. that she had given to him.

Bennett replied, "You do not seem 13."  Bennett then told M.C.W. that he wished she

"was not 13 and far away."  In another email, Bennett described himself as a "hopeless

romantic" and says that he "really like[d] talking to [her] very much."  M.C.W.

responded:

> Well, suffice it to say were you close, Anthony would have serious
> competition for my attention.  But since you don't and even if you were,
> I'm a minor, I guess it's pointless to speculate.  It's a pity though.  I do
> enjoy talking to you a lot and you seem like someone I'd enjoy the
> company of too.

Bennett responded by asking M.C.W. whether there was "a law about minors

hanging out with people older," to which M.C.W. responded:

> If parents don't approve, yes, but even so, I'd find it hard to pass up an
> opportunity for a slightly more than platonic relationship [with] you had I
> the ability, so it would end up illegal either way most likely.

Soon after, Bennett's emails included discussions of the possibility of him moving

to Texas to live with his half-sister.  He suggested more than once that M.C.W. could

show him around and be his guide.  He then asked M.C.W, "just hypothetically, if I came

to take you to anyplace you wanted to go, you would not run away with me?"  M.C.W.

responded that the proposal was "a pretty powerful lure, you and being able to travel, yes,

bottom line, yes."  During the month of August, M.C.W. and Bennett often told each

other they loved each other and began to discuss moving in together somewhere in Texas.

Soon after, Bennett purchased a car.

5

On August 29, 2004, Bennett posted an entry on his webpage stating that he was moving to Texas to be with his love and start a new life. Bennett then moved to Pilot Point, Texas and began residing with his half-sister. It was at this point that he and M.C.W. began to communicate by telephone as well.

Eventually, in August or September of 2004, M.C.W. and Bennett arranged to meet in person. Bennett's friend Charles Massey drove him to a movie theater where M.C.W. had been dropped off with her friend, A.L. Once Massey and Bennett arrived, A.L. went into the theater, as planned, and M.C.W. got into the car. Massey then drove to a restaurant and went inside to eat while Bennett and M.C.W. remained inside the car. During this time, M.C.W. and Bennett kissed, and at one point, Bennett removed his shirt.[4] M.C.W. testified that their plan at that time was to have a "romantic but platonic relationship" and to wait to have sex until she was legal. However, she also testified that if they had not been interrupted by A.L.'s phone call reminding them to return to the movie theater, she believes she and Bennett might have had sex in the car. A.L. testified that M.C.W. told her that she and Bennett did have sex in the car.

M.C.W. testified that, during a weekend in late October 2004, her father, who was drunk, pushed her against the wall, grabbed her chest area, and pinned her down. She

---

[4] The government produced a photo depicting Bennett without his shirt. M.C.W. had posted this photo on her webpage, with a caption indicating that it was taken after she and Bennett were "interrupted" by A.L.'s phone call.

testified that she then escaped, locked herself in her room, and decided she was going to run away and hitchhike if necessary. After this confrontation, she slept at A.L.'s house and told A.L. that she was going to run away with Bennett. She then sent Bennett a text message telling him that she urgently needed him to come and get her, that she was afraid, and that she was going to leave. M.C.W. testified that she insinuated to Bennett that something physical and sexual had occurred with her father. M.C.W. testified that Bennett responded by comforting her and asking her if she was sure (presumably about her decision to leave). The next day, M.C.W. asked Bennett if he would come and get her that night, and Bennett agreed. That night, October 25, 2004, after M.C.W.'s parents went to bed, she left notes for both parents,[5] cut the screen of her window, jumped out, and waited outside until Bennett picked her up. Later that night, M.C.W.'s mother noticed she was gone and reported her missing.

That night, Bennett drove M.C.W. to Huntsville, Texas, where they spent the night at a motel and had sexual intercourse more than once. M.C.W. testified that during their

---

[5] M.C.W.'s note to her mother, which was produced at trial, reads, in part, as follows:
Mom, I'm so sorry. You deserve a much better daughter. I've been planning this trip for years. You didn't do anything wrong. This isn't your fault. I need a vacation, a long vacation. There is no way to describe the things I'm feeling or to justify the pain I'm putting you through, but it has to happen, I have to get away, go far away for a while, just me, myself and I. I love you more than anything in the universe and I'm sorry for everything that happens in my absence, just as I'm sorry I couldn't be a better daughter. I would suggest you don't go looking for me, but I know you will anyway. . . .

first sexual encounter of the evening, they used a condom provided by Bennett. She further testified that it was her idea to have sex and that Bennett resisted at first.

The next day, after receiving an angry voicemail from M.C.W.'s father, Bennett had his cell phone disconnected. M.C.W. testified that they traveled to Dallas, where they attempted to spend the night at Massey's house. Once they arrived, they were turned away because Massey knew that M.C.W. was underage. That night, M.C.W. and Bennett slept in an apartment complex parking lot in the car.

M.C.W. testified that their plan at this point was to travel to Washington to stay with Bennett's mother.[6] M.C.W. testified that the next day, they continued heading north and drove into Oklahoma, where Bennett called his mother from a payphone. Bennett's mother informed Bennett that the FBI was looking for him and urged him to turn himself in. M.C.W. testified that she then told Bennett that she refused to return but that she "wouldn't hold it against him" if he turned himself in. M.C.W. testified that Bennett responded that they would continue on.

At that point, Bennett and M.C.W. abandoned the car and most of their possessions, and began hitchhiking on a path that led them through Oklahoma, California,

---

[6] M.C.W. testified that, at some point before they left League City, Texas together, she and Bennett discussed the prospect of living in Texas with his half-sister. She further testified that on the drive north through Texas, they did not discuss this possibility because they knew that Bennett's half-sister was aware that M.C.W. was underage.

Nevada, Arizona, Oregon, and finally, back in California, specifically, San Francisco, where they remained for about two weeks until they were found.

During their time in San Francisco, Bennett and M.C.W. slept in parks, shelters, and at the home of a friend of a hitchhiker they met during their travels. M.C.W. testified that during this time, they used drugs, including marijuana and mushrooms. She further testified that during this time, she and Bennett had sex about every other night. On November 23, 2004, Bennett sent an email to M.C.W.'s mother from a computer at a McDonald's in San Francisco. The email was a response to an October 25, 2004 email that Cynthia sent to Bennett, imploring him to at least let her know that M.C.W. was all right. In the response, Bennett stated that he loved M.C.W. "more than life itself," that he understood Cynthia's pain, and that they were "trying to figure out some middle ground in all of this." Bennett went on to state that "[their departure] may have been a bit rash" and that "[M.C.W.] begged and pleaded with [him] to leave." M.C.W. also sent her mother an email from this computer, stating that she was sorry she hadn't called sooner, that she was doing "really well," that she was "not doing anything [her mother] wouldn't support," that she loved and missed her, that she was sorry for leaving like she did, that she didn't leave because of her, that Bennett was a "deeply good person" who was "so good to her," that she didn't need to worry about her as long as she was with Bennett, and

that she was "learning a lot and growing a lot." The next day, November 24, 2004, Bennett and M.C.W. were arrested after the IP address on the computer was traced.

At trial, when asked by the prosecutor whether, looking back on all that had occurred, she could say that she was thinking right or thinking clearly at the time, M.C.W. responded, "I made some unwise choices, but I mostly feel guilty for manipulating Paul."

A search of Bennett's hard drive revealed that during the time he was communicating with M.C.W., he was engaging in similar online communications, some of an erotic and sexual nature, with other teenage girls. These emails were produced at trial, which began on April 24, 2006.

After hearing the evidence, the jury returned a verdict of guilty as to both Count One (kidnaping) and Count Three (§ 2423(a) of the Mann Act, transporting a person in interstate commerce with intent to engage in criminal sexual activity). The jury acquitted Bennett on Count Two (§ 2422(a) of the Mann Act, *enticing* the minor victim to travel in interstate commerce to engage in sexual activity). The district court denied Bennett's motion for judgment of acquittal at both the close of the government's case and at the close of all evidence.

After the jury was excused, Bennett reurged his motion for judgment of acquittal, which the district court granted as to Count One, kidnaping, and denied as to Count

Three. Specifically, the district court acquitted Bennett on Count One because he reasoned that M.C.W. willingly went with Bennett and was not forced to go against her will. Bennett was sentenced to 81 months of imprisonment, to be followed by a 10-year term of supervised release. Bennett timely filed a notice of appeal, wherein he brings the following six challenges: (1) that the district court abused its discretion in admitting the expert testimony of Martha Finnegan; (2) that the district court erred in instructing the jury that a presumption exists that a person under the age of 14 is incapable of consenting to travel or being transported and that it was the defense's burden to prove by a preponderance of the evidence that M.C.W. had the capacity to consent; (3) that the evidence was insufficient to support Bennett's Mann Act conviction; (4) that the government engaged in improper and prejudicial closing argument warranting reversal; (5) that venue was improper in the Southern District of Texas; and (6) that his sentence was unreasonable under 18 U.S.C. § 3553(a).

## ANALYSIS

**1)      The Expert Testimony of Martha Finnegan**

This Court reviews a district court's decision to admit or exclude evidence under an abuse of discretion standard. United States v. Cantu, 167 F.3d 198, 203 (5th Cir. 1999). A decision to admit expert testimony is governed by the standards in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). See Moore v. Ashland Chem.

11

Inc., 151 F.3d 269, 274 (5th Cir. 1998)(en banc).  Expert testimony is admissible "'if

scientific, technical, or other specialized knowledge will assist the trier of fact. . . .'" Id.

at 274 n.5 (quoting Fed. R. Evid. 702).

On April 19, 2006, Bennett filed a motion to strike the expert testimony of Martha

Finnegan, and in the alternative, for a continuance in order to prepare for Finnegan's

testimony and to obtain and consult with his own expert.  The district court denied the

motion.  At trial, after voir dire, Bennett's counsel objected to the admission of the

testimony.  The district court overruled the objection.

On appeal, Bennett argues that Finnegan was not properly qualified to testify

about the topic of "compliant victims."[7]  He also argues that her testimony was unreliable

and irrelevant.  First, Bennett argues that Finnegan was not qualified to testify about

teenagers in general or about compliant victims in particular for the following reasons: (1)

her experience consisted only of interviewing victims or witnesses to alleged crimes; (2)

she had not conducted any studies of normal teenagers outside criminal investigations;

and (3) she had no education, training, or experience pertaining to normal teenagers that

would permit her to distinguish between victims and non-victims.

---

[7]    Compliant victims were described by Finnegan as "victim[s] who ha[ve] participated
in [their] own victimization."

12

As to Finnegan's qualifications, the government argues that Finnegan's personal experience, education, training, and observations sufficiently qualified her to testify regarding compliant victims and adolescent behavior. We agree.

For two years, Finnegan worked as a child interviewer with the FBI's Innocent Images Initiative, the goal of which was to combat the online exploitation of children. After this, she worked in the FBI's office of victim assistance, where she interviewed children that were exploited online and in other ways, including children that have been abducted, sexually abused, and physically abused. Finnegan also trained others in the technique of interviewing children. Before working for the FBI, Finnegan worked for about two years for the National Center for Prosecution of Child Abuse and trained prosecutors, law enforcement officers, victim advocates, and forensic interviewers on how to interview children. Before that, she worked for the Center for Child Protection at Children's Hospital in San Diego for about three years, during which time she conducted forensic interviews of both victims of physical and sexual abuse, and witnesses of domestic violence or homicides. Finnegan estimated that she had conducted about 500 interviews with children or adolescents, the majority of which involved children that had been exploited online. She estimated that approximately 100 of the victims she interviewed were "compliant victims." In light of this extensive experience, we find that the district court acted within its discretion in finding that Finnegan was qualified to

13

testify on the subject of compliant victims.

Second, Bennett argues that Finnegan's testimony was unreliable because she did not point to any peer reviewed study, article, or body of work that she relied on in defining compliant victims as a group or in categorizing the behavior of such persons. As we found in United States v. Hitt, 473 F.3d 146, 158-59 (5th Cir. 2006), a district court's decision to admit expert testimony regarding behavior sometimes exhibited by sexual abuse victims in returning to their abusers ("return-to-the-abuser behavior") was not an abuse of discretion. District courts are afforded deference in "gate-keeping" scientific evidence, and the application of Daubert should be flexible. The "return-to-the-abuser" testimony upheld in Hitt is similar to the "compliant victim" testimony admitted in this case. Both deal with the tendency of sexual abuse victims to exhibit behaviors that facilitate further abuse.

Third, Bennett contends that Finnegan's testimony was irrelevant to the case because Finnegan never interviewed M.C.W., did not listen to M.C.W.'s trial testimony, and did not appear to have any real knowledge of the facts of the case. Bennett also argues that Finnegan's testimony that a person who runs away from victimization does not fit the definition of a compliant victim establishes that M.C.W. was not, in fact, a compliant victim because she ran away from her father. We disagree. The fact that M.C.W. ran away from her abusive home life does not mean that she was not a compliant

14

victim *with respect to Bennett*. In fact, Finnegan's testimony indicated that, as is common with sexual abuse victims, M.C.W.'s prior sexual abuse made it *more likely* that she would later become a compliant victim of an older adult male.

Bennett further asserts that Finnegan's testimony, coupled with the government's characterization of M.C.W. as a "compliant victim," encouraged the jury to disregard M.C.W.'s testimony that the purpose of the travel was to get away from her abusive home and that sex was merely incidental to the travel. According to Bennett, Finnegan's testimony suggested that M.C.W. was incapable of comprehending Bennett's purposes in traveling, which in turn, caused the jury to disregard her testimony, which, if considered, would have provided more than ample reason to acquit Bennett on Count Three.

This argument fails because Count Three, at most, requires that sex be *one of* the purposes of travel, not *the only* purpose. United States v. Garcia-Lopez, 234 F.3d 217, 220 (5th Cir. 2000). Regardless of what M.C.W. believed Bennett's purpose(s) in transporting her was, and regardless of the weight the jury gave to M.C.W.'s belief, sufficient evidence was put forth at trial for a rational jury to find that one of Bennett's purposes in transporting M.C.W. was to engage in sexual activity with her.

Bennett also argues that the district court abused its discretion in denying his motion for continuance, which was urged in the alternative to his motion to strike, in order to obtain an expert of his own to contradict or explain Finnegan's testimony. The

15

government responds that it was not even required to give notice of the expert to Bennett because he failed to request notice of the expert under Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure. The government further asserts that Bennett has failed to: (1) show due diligence to obtain the attendance of an expert to refute Finnegan's testimony, (2) show that this expert was available and willing to testify, and (3) show that the testimony would be favorable. United States v. Scott, 48 F.3d 1389, 1394 (5th Cir. 1995)(citations omitted).

This Court reviews the denial of a request for continuance for an abuse of discretion. United States v. Olaniyi-Oke, 199 F.3d 767, 771 (5th Cir. 1999). During oral argument on the motion to strike, the district court noted that it was highly unlikely that any expert would testify that teenagers were not susceptible to flattery. The district court asked Bennett's counsel what he would seek to have such an expert testify to at trial. Bennett's counsel responded that the expert would argue "[that] this is not even a recognized field for the qualified testimony." The district court responded that such an issue "under 104(e) goes to weight and not its admissibility." (Rec. Doc. No. 128). We agree. The district court, thus, did not abuse its discretion in denying the motion to continue.

Given the district court's wide latitude in exercising its gate-keeping function, it acted within its discretion in allowing Finnegan's testimony.

16

**2) The District Court's Jury Instructions Regarding Presumption**

This Court ordinarily reviews challenges to jury instructions for an abuse of discretion. United States v. Monroe, 178 F.3d 304, 307 (5th Cir. 1999). However, the issue of whether the jury instructions violated Bennett's Sixth Amendment right to trial by jury and his Fifth Amendment right to a conviction based upon proof beyond a reasonable doubt are constitutional questions of law, which are reviewed de novo. United States v. Webster, 162 F.3d 308, 333 (5th Cir. 1998). If a constitutional violation occurred, the next question is whether the error was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967).

During voir dire, immediately after instructing the jury regarding the burden of proof, the district court explained to the jury:

> [T]he question is going to be or arguably would be: Did MCW, a minor in this case at the time of the alleged [offense] at the age of 13 years and 51 weeks, consent to activities, to wit, being transported across state lines against her will?
>
> I'm going to instruct you that the law presumes that an alleged victim of such a crime cannot consent at that age. But that presumption can be overcome by a preponderance of the evidence. In other words, if the defendant offers evidence that the victim was, in fact, not coerced against her will but voluntarily and willingly went along this and establishes that by a preponderance of the evidence, you can set that presumption aside and decide that, in fact, she was not forced to go. But the law is that she is presumed not to be able to consent to that absent a showing by a preponderance of the evidence.

17

Later during voir dire, after explaining the elements of Count Three (the count of conviction) to the jury, the district court told the jury:

> [I]t is presumed that the defendant [sic, victim] at the age of 13 years and 51 weeks cannot consent to being transported across state lines to engage in sexual activities. That is a rebuttable presumption and can be rebutted by a preponderance of the evidence, in other words, a showing that you believe is more preponderant or preponderates however much in favor of the offer of that defense in the case.

At the close of the evidence, the district court instructed the jury as follows regarding the kidnaping charge (Count 1):

> To "kidnap" a person means to unlawfully hold, keep, detain, or confine the person against that person's will. Involuntariness or coercion in connection with the victim's detention is an essential part of the offense.
>
> However, where the alleged victim is under 14 years of age at the time of the alleged offense, there is a rebuttable presumption that the victim does not have the capacity to consent. Any confinement of such child must be proven to have been with authorization from a parent or legal guardian, because the victim is rebuttably presumed not to be able to consent to being abducted, carried away, inveigled, or kidnapped by a defendant. This presumption can be rebutted by evidence that convinces you by a preponderance of the evidence, that the victim indeed possessed capacity to consent. To prove something by a preponderance of the evidence means to prove that it is more likely so than not so. Preponderance of the evidence is determined by considering all the evidence and deciding which evidence is more convincing. . . . If the evidence appears to be equally balanced, or if you cannot say upon which side it weighs heavier, you must resolve this question against the Defendant. However, remember that the burden of proof always remains on the Government to prove each element of each crime alleged in the Indictment.

Bennett contends that the instructions in question placed an improper burden on the defense, diluted the other instructions regarding proof beyond a reasonable doubt, and

18

undermined M.C.W.'s credibility to Bennett's detriment. Bennett argues that the instructions in question violated his Sixth Amendment right to a trial by jury and his Fifth Amendment right to be convicted only on proof beyond a reasonable doubt.

Bennett argues that the federal law does not include a presumption of incapacity to consent based on age, and the reliance on <u>Chatwin v. United States</u>, 326 U.S. 455 (1946) for the crafting of such presumption was improper. The government asserts that any error was harmless beyond a reasonable doubt. Bennett argues that the Court in <u>Chatwin</u> specifically rejected any per se rule of incapacity to consent based on the victim's minority status.

The Court in <u>Chatwin</u> did, indeed, reject such a rule; however, the context in which it did so is not as clearly delineated as suggested by Bennett. In <u>Chatwin</u>, a 15-year-old girl who allegedly had a mental age of seven, ran away with members of a fundamentalist Mormon cult and participated in a celestial marriage with one of its members. The prosecution argued that the girl was incapable of understanding the nature of celestial marriage and defendants' solicitations due to "her tender years and extremely low mentality." <u>Id.</u> at 459. The Court stated that "[i]f the victim is of such an age or mental state as to be incapable of having a recognizable will, the confinement then must be against the will of the parents or legal guardian of the victim." <u>Id.</u> at 460. The Court found that there was "no competent or substantial proof that the [fifteen-year-old] girl was

19

of such an age or mentality as necessarily to preclude her from understanding the doctrine of celestial marriage and from exercising her own free will, thereby making the will of her parents . . . the important factor." Id. at 461.

The Court went on to state that "[t]here is no legal warrant for concluding that such an age [of 15 years and 8 months] is ipso facto proof of mental incapacity in view of the general rule that incapacity is to be presumed only where a child is under the age of 14." Id. (citing *Wigmore on Evidence* (3d ed.)). The Court further reasoned that, even if it had been proven that the girl had a mental age of seven, such age "cannot be said necessarily to preclude one from understanding and judging the principles of celestial marriage and from acting in accordance with one's beliefs in the matter." Id. at 462.

> The serious crime of kidnaping should turn on something more substantial than such an unexplained mathematical approximation of the victim's mental age. There must be competent proof beyond a reasonable doubt of a victim's mental incapacity in relation to the very acts in question before criminal liability can be sanction in a case of this nature.

Id.

Under Chatwin, the presumption crafted by the district court in this case was improper. If a "mental age of seven" is not sufficient to presume incapacity to join a cult and participate in a celestial marriage, for example, then it would seem *a fortiori* that an actual age of fourteen "cannot be said necessarily to preclude one from" consenting to traveling or being transported. Thus, it seems that this presumption improperly relieved

the prosecution of its burden of persuasion on the consent element of the kidnaping offense, Francis v. Franklin, 471 U.S. 307, 315 (1985), and Bennett's constitutional rights were violated.

However, even so, such error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24 (1967). In this case, the jury convicted Bennett on the kidnaping charge (Count One). However, the district court later granted Bennett's motion for judgment of acquittal with respect to Count One. Thus, any error was harmless with regard to Count One.

As to Count Three, on which Bennett was also convicted, Bennett contends that the district court's instructions on the presumption made it "virtually impossible for the jury to compartmentalize the issues of capacity and consent from the purposes of her being transported" and diluted other instructions regarding the government's burden of proof. When a jury charge is challenged, it must be judged in the context of the overall charge. Cupp v. Naughten, 414 U.S. 141, 147 (1973). The judge gave the jury the following instruction:

> A separate crime is charged in each count of the Indictment. Each count, and the evidence pertaining to it, should be considered separately. The fact that you may find the Defendant guilty or not guilty as to one of the crimes charged should not control your verdict as to any other.

It is undisputed that consent is not an element of the offense on which Bennett was ultimately convicted under the Mann Act. If the jury heeded the above instruction, as it is

21

presumed to have done, then it did not consider the presumption of lack of consent in connection with its deliberations on Count Three.

Morever, even if the lack of consent presumption did "spill over" into the jury's deliberations on Count Three, our conclusion would be the same. Even if the jury did presume that M.C.W. could not consent to being transported in connection with its deliberations on Count Three, consent is irrelevant to a conviction under § 2423(a). Indeed, the very purpose for enactment of the Mann Act was to address situations where the victim consented to the exploitation.

Last, as for Bennett's argument that the presumption caused the jury to discredit M.C.W.'s testimony on Bennett's intent and purpose in transporting her, there was ample evidence in this case (discussed *infra*), which demonstrated that Bennett transported M.C.W. with the intent to have sex with her. Thus, even if a violation did occur, we find the error was harmless beyond a reasonable doubt.

**3)      Sufficiency of the Evidence**

Because Bennett moved for judgment of acquittal at the close of the Government's case and at the close of all evidence, he properly preserved his sufficiency of the evidence challenge, which is reviewed de novo. See United States v. Izydore, 167 F.3d 213, 219 (5th Cir. 1999).

22

This Court must affirm a conviction if the evidence, viewed in the light most favorable to the verdict, with all reasonable inferences and credibility choices made in support of it, is such that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Ramirez, 954 F.2d 1035, 1039 (5th Cir. 1992). The inquiry is whether the jury made a rational decision, not whether the jury's verdict was ultimately correct. United States v. Jaramillo, 42 F.3d 920, 923 (5th Cir. 1995). "The intent necessary to support a conviction can be demonstrated by direct or circumstantial evidence that allows an inference of an unlawful intent, and not every hypothesis of innocence need be excluded." United States v. Aggarwal, 17 F.3d 737, 740 (5th Cir. 1994). However, reversal is required if the evidence viewed in a light most favorable to the verdict "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged." Jaramillo, 42 F.3d at 923 (internal quotations and citations omitted).

Bennett challenges the sufficiency of the evidence underlying his conviction under the Mann Act for transporting a minor with the intent to engage in criminal sexual activity (Count Three). According to Bennett, the government failed to prove beyond a reasonable doubt that Bennett transported M.C.W. for an unlawful sexual purpose.

"To establish a violation of the Mann Act, one of the essential elements is that the defendant transported his victim with the intent that she engage in [criminal sexual

23

activity]." United States v. Campbell, 49 F.3d 1079, 1082 (5th Cir. 1995). "While this intention to engage in illicit activity must be a 'dominant motive' of such a trip, Mortensen v. United States, 322 U.S. 369, 374, 64 S. Ct. 1037, 1040, 88 L. Ed. 1331 (1944), this circuit has interpreted this phrase narrowly, allowing prosecution when a defendant had several purposes for the travel." Id. This circuit has stated that:

> [I]t is not necessary to a conviction under the Act that the sole and single purpose of the transportation of a female in interstate commerce was such immoral practices. It is enough that one of the dominant purposes was [criminal sexual activity]. It suffices if one of the efficient and compelling purposes in the mind of the accused in the particular transportation was illicit conduct of that kind. The illicit purpose denounced by the Act may have coexisted with other purpose or purposes, but it must have been an efficient and compelling purpose.

Id. at 1082-83 (citing Forrest v. United States, 363 F.2d 348-49 (5th Cir. 1966).

We note, if only for academic purposes, that the Supreme Court in Mortensen, in holding that the intention to engage in illicit activity must be a "dominant motive " of such a trip, effectively added a motive requirement to the burden of proof. Without getting into the necessity and/or propriety of the Court's addition of motive as a layer of proof[8] in this case, the evidence presented at trial sufficiently establishes both that Bennett transported

---

[8]  18 U.S.C. § 2423(a) makes no mention of purpose or motive. It simply requires that the transportation of the individual be "with intent that the individual engage in [criminal sexual activity]." Interestingly, § 2423(b) specifically mentions purpose ("A person who travels in interstate commerce or travels into the United States . . . *for the purpose of* engaging in any illicit sexual conduct with another person . . .")(emphasis added). It seems that if Congress meant for "purpose," at least to the extent that purpose means motive, to be part of § 2423(a), it would have included such language.

24

M.C.W. with the intent to have sex with her and that this intent to have sex with her was one of his dominant purposes for transporting her.

Bennett contends that the government failed to prove that the unlawful sexual activity was one of the principal or dominant purposes of the travel. Bennett asserts that "the government failed to show that sex motivated the travel at all." According to Bennett, the evidence demonstrated, at most, that the sexual activity was incidental to travel. He argues that the evidence showed that Bennett's intent was to stay in Texas and not to travel interstate.

We agree with the government's assertion that the evidence of Bennett's email communications with M.C.W., particularly when viewed in light of his erotic emails with other persons purporting to be teenage girls, supports the inference that Bennett wanted to transport M.C.W. so that he would be able to have a sexual relationship with her. In fact, the jury was specifically instructed that, although it could "not consider any of this evidence in deciding if Defendant possessed a certain character and acted in conformity therewith," it could:

> consider this evidence . . . to determine whether or not Defendant's actions
> prove motive, opportunity, intent, preparation, plan, knowledge, or absence
> of mistake or accident, in relation to the acts charged in the Indictment.

The jury was further instructed:

> If you find beyond a reasonable doubt from other evidence in this case that
> the Defendant did commit the acts charged in the Indictment, then you may

25

consider evidence of similar acts allegedly committed on other occasions to determine whether the Defendant had the state of mind or intent necessary to commit the crime charged in the indictment.

Further evidence supporting an inference that Bennett intended to engage in sexual activity with M.C.W. is the fact that, as M.C.W. testified, on the night that Bennett and M.C.W. first met, they were kissing and might have had sex had they not been interrupted. At this point, as the photograph taken by M.C.W. and produced at trial demonstrated, Bennett was already naked from the waist up. In light of this evidence, a rational jury could easily have inferred that Bennett had the intent to have sex with M.C.W., wherever their travels took them.

Furthermore, within hours after picking up M.C.W. from her home, Bennett checked them into a motel in Huntsville, Texas and had sex with her using a condom that he had brought. The next day, after being turned away from Massey's house in Dallas, it became apparent to Bennett that, if he and M.C.W. were going to continue this sexual relationship, they would need to leave the state of Texas. That day, they crossed over the state line into Oklahoma, and they continued to have sex on a regular basis for the duration of the trip. A jury could rationally infer from the sexual activity that occurred both before and after state lines were crossed, that Bennett transported M.C.W. with intent to engage in sexual activity with her.

In conclusion, the government presented sufficient circumstantial evidence from which a jury could rationally conclude that Bennett had the illicit intent necessary to support the Mann Act conviction. The evidence presented and reasonable inferences drawn therefrom certainly supported the finding of fact that before leaving Texas, Bennett had formed the intent to engage in sexual activity with M.C.W. See United States v. Diaz, 95 Fed.App'x. 535, 538 (5th Cir. 2004), vacated on other grounds, 543 U.S. 1099 (2005).

**4)    The Government's Closing Statement**

During closing argument, the prosecutor stated that "[i]f the law has a name for men who like little girls, who have sex with little girls, that is pedophile." Bennett's trial counsel objected, and the trial judge overruled the objection. Bennett now argues that this remark was prejudicial, that there was no cautionary instruction given, and the evidence of his guilt was "very weak."

Improper prosecutorial comments constitute reversible error only where the defendant's right to a fair trial is substantially affected. United States v. Bernard, 299 F.3d 467, 488 (5th Cir. 2002). "The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." United States v. Holmes, 406 F.3d 337, 356 (5th Cir. 2005). "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." United States v. Lowenberg, 853 F.2d 295, 302 (5th Cir. 1988) (internal quotation marks omitted).

27

"Improper argument warrants reversal when 'taken as a whole in the context of the entire case, [it] prejudicially affect[ed] substantial rights of the defendant.'" United States v. Hitt, 473 F.3d 146, 161 (5th Cir. 2006)(quoting United States v. Corona, 551 F.2d 1386, 1388 (5th Cir. 1977)). Bennett must establish that the comment substantially affected the jury's verdict. See United States v. Freeman, 434 F.3d 369, 375 (5th Cir. 2005). To make this showing, the court focuses on three factors: (1) the magnitude of the prejudicial effect of the prosecutor's remarks; (2) the efficacy of any cautionary instruction by the judge; and (3) the strength of the evidence supporting the conviction. Lowenberg, 853 F.2d at 302.

As for the first factor, we find that the prejudicial effect of labeling Bennett a "pedophile" was not substantial. Although it is undisputed that M.C.W. and Bennett had sex, it is also undisputed that at the time they had sex, Bennett was 22 and M.C.W. was 13 and, later, 14 years old. The criminal statutes that formed the basis of the Mann Act charges were state statutes criminalizing the act of having sex with a person under the age of 18. The government admitted evidence of several emails wherein Bennett spoke in a sexually suggestive manner to persons who identified themselves as being teenage girls. A pedophile is an adult who is sexually attracted to a child or children.[9] Based on this definition, we can reasonably assume that the members of the jury already had associated

_____

[9] The American Heritage Dictionary of the English Language 1296 (4th ed. 2000).

28

the word "pedophile" once they heard testimony that Bennett had sex with a child. Thus, while the fact that the prosecutor said this word in closing arguments may have caused *some* prejudice, it did not cause *substantial* prejudice as the word is fairly common and, more likely than not, had occurred to the jurors after hearing the evidence.

In Lowenberg, the prosecutor referred to the defendant as a "filthy pimp." 853 F.2d at 302. This Court found the error to be harmless, noting that the trial court gave a cautionary instruction, and that the statement was made to "reinforce the prosecution's interpretation of [the defendant]'s actions" in putting "one of the witnesses into the prostitution business and collecting a portion of her earnings." Id. The Court found that "filthy pimp" in those circumstances was a "fair interpretation of the evidence." Id. Similarly, in this case, the Court concludes that the prosecutor's use of the term "pedophile" was a fair interpretation of the evidence.

With respect to the second factor, the Court did, indeed, give a cautionary instruction, contrary to Bennett's assertion on appeal. The judge instructed the jury that they were to "consider only the evidence presented during the trial, including the sworn testimony of the witnesses and the exhibits." He further instructed the jury that "any statements, objections, or arguments made by the lawyers are not evidence."

On the third and final factor, the Court has already determined that the strength of evidence supporting the conviction was strong. Thus, reversal is not warranted based on the prosecutor's comment in closing argument.

**5)       Venue**

This Court generally reviews venue issues for abuse of discretion. United States v. Delgado-Nunez, 295 F.3d 494, 496 (5th Cir. 2002). However, this question is effectively de novo because "[a] district court by definition abuses its discretion when it makes an error of law." Id. (internal quotation marks omitted).

The general venue statute provides, in pertinent part:

> Any offense involving . . . transportation in interstate or foreign commerce . . . is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce . . . moves.

18 U.S.C. § 3237(a).

Bennett argues that, for purposes of venue, the government failed to prove that any part of the offense occurred in the Southern District of Texas. Bennett supports this argument by contending that he did not form the intent to travel to another state until he left the Southern District of Texas.

The government correctly asserts that although the interstate transportation requirement of the Mann Act is an element of federal jurisdiction, it is not part of the

knowledge requirement for a Mann Act conviction.  This circuit has recognized that the transportation of the victim in interstate commerce is jurisdictional and not an element of the crime.  United States v. Jackson, 978 F.2d 903, 910-11 (5th Cir. 1992)(kidnaping statute did not require defendant's knowledge that victim would be moved in interstate commerce); United States v. Barksdale-Contreras, 972 F.2d 111, 114 (5th Cir. 1992)("Proof of transportation of a kidnapped victim in interstate or foreign commerce is necessary to establish federal jurisdiction.  Knowledge by the kidnappers of the crossing of boundaries is not a necessary element of the offense."); United States v. Bankston, 603 F.2d 528, 532 (5th Cir. 1979)(kidnaping statute did not require defendant's knowledge that he was crossing state lines)(quoting United States v. Napier, 518 F.2d 316, 319 (9th Cir. 1975)("requirement that the offender cross state lines merely furnishes a basis for the exercise of federal jurisdiction and does not constitute an element of the [kidnaping] offense").

Viewed in the light most favorable to the verdict, the evidence supports a finding that venue in the Southern District of Texas was proper.  Because transportation in interstate commerce is an element of 18 U.S.C. § 2423(a), under the venue statute, §2423(a) is a continuing offense.  The venue statute provides, in pertinent part:

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be

> inquired of and prosecuted in any district in which such offense was begun, continued, or completed.
>
> Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

18 U.S.C. § 3237(a). This element does not require proof that the defendant *knew* he was traveling in interstate commerce. Thus, the fact that Bennett may not have decided to leave the state until after he left the Southern District of Texas is irrelevant to the venue determination. Under § 3237(a), venue is proper because Bennett moved both *from* and *through* the Southern District of Texas.

**6)      The Weight Given to the Sentencing Guidelines**

Because Bennett's trial counsel did not object to the weight given to the Sentencing Guidelines in the trial court, the government argues that this Court's review should be limited to review for plain error. See United States v. Everist, 368 F.3d 517, 520 (5th Cir. 2004)(review for plain error of claim that a sentencing court did not comply with the statutory requirement to consider the §3553(a) factors in determining whether to order concurrent sentences.)  Bennett, on the other hand, contends that the proper standard for this Court to employ is abuse of discretion.  United States v. Reinhart, 442 F.3d 857, 862 (5th Cir. 2006). This Court invokes the plain error standard; however, we note that our

32

decision would be the same under either standard as we find that the sentence given to Bennett was reasonable and justified in all respects and was, thus, neither plainly erroneous nor an abuse of discretion.

In support of this assertion on appeal, Bennett argues that this Court has improperly established a presumption that guidelines sentences are reasonable. According to Bennett, this court has "reestablished the primacy of the Sentencing Guidelines in a manner that discourages district courts from considering all the 18 U.S.C. § 3553(a) factors and imposing sentences that diverge substantially from the Guidelines range." However, Bennett concedes that his disagreement with the presumption of reasonableness is foreclosed under current Fifth Circuit law. Instead, he raises the issue here in an effort to preserve it for further review in the event the Supreme Court alters the current federal sentencing landscape in the future.

Next, Bennett contends that his sentence is unreasonable even under the current regime of reasonableness review. He claims that the district court's sentence (1) failed to account for factors that should have received significant weight and (2) represented a clear error of judgment in balancing the sentencing factors.

Bennett initially entered a plea of guilty to Count 2, pursuant to a plea agreement in which the government agreed to recommend a 24-month term of imprisonment. At the rearraignment, the district court indicated that, even though it considered the Guidelines

"so useful as to be binding, in all practical matters," it was willing and likely to accept the non-Guideline sentence recommended by the government. The presentence investigation report was prepared, and after giving Bennett a three-level reduction for acceptance of responsibility, it calculated his Guideline sentence as between 57 and 71 months. On the day of sentencing, the district court informed the government and the defendant that it had "no problem at all operating within the guidelines" and that it was "not going to agree to a 24-month deal . . . ." Bennett then withdrew his guilty plea and the case proceeded to trial.

After the jury verdict, a new presentence investigation report was prepared, which calculated the Guideline range, without an adjustment for acceptance of responsibility, at 78 to 97 months. Count Three carried a mandatory minimum sentence of five years imprisonment. The district court imposed an 81 month sentence of imprisonment, to be followed by a 10-year term of supervised release.

Bennett now claims that the district court failed to explain why it rejected the 24-month recommendation from the government and merely noted that it was inclined to operate within the guidelines. Bennett also insists that many mitigating factors came to light at trial, specifically, testimony that "M.C.W. was being sexually abused at home, and that M.C.W. fled from that environment," that she "had planned on running away for a

34

long time, and had always wanted to go to San Francisco, where the couple was eventually arrested."

Bennett claims that the district court had no justification for imposing the "extra fifty-seven months" other than "blind adherence to the guidelines." In support of his argument that the district court put undue weight on the guidelines, Bennett refers to "the district court's statement that it views the sentencing guidelines to be binding."

The sentence given to Bennett was reasonable and justified. First, the district court's exact words, which Bennett quotes in his brief, were: "[I]t is my intention to be bound by the sentencing guidelines. Even though *they are not mandatory, I consider them so useful as to be binding*, in all practical matters." Second, at the rearraignment, the district court specifically admonished Bennett that "once a presentence investigation report is prepared and promulgated or you do something completely goofy between now and sentencing, I have the discretion not to [accept the 24-month recommended sentence]." The plea agreement at issue contained a condition that Bennett "have no contact in any way with the victim in this case." The final pre-sentence report reviewed by the Court prior to sentencing indicated that Bennett had written a letter to M.C.W., despite being ordered not to contact her. Third, in imposing the sentence, the district court specifically referred to the trial evidence, including the evidence of the sexually explicit emails Bennett sent to other teenage girls, pointing to the dangerous nature of the

35

defendant.  This evidence establishes more than a reasonable justification for the sentence imposed.

## **CONCLUSION**

Finding no merit in any of Defendant's arguments, we AFFIRM both his conviction and sentence.